Good morning, Honorable Justices of the Appellate Court and Mr. Seidman. May it please the Court, my name is Robert Newman. I'm present for the Appellant to the Algin Board of Education, School District 46. In this case, I'll just give you a few minutes of the factual background. Ms. Linda S. Weiler was a teacher of English as a second language in an elementary school run by Algin Board of Education. She'd been affiliated with the school as a teacher for more than 20 years. Now, she had a knee surgery on November 7th of 2002. That's actually six days before the accidental injury that she claims in this case. There's no claim that anything to do with the work caused or contributed to the need for the knee surgery in the first place. Now, the accident she claims is that when she returned to work, actually on the second day back, which was November 13th, 2002, a boy raised his hand and the teacher was seated at her own desk. The boy raised his hand, she stood up, walked around her own desk to go by the boy's desk to find out what he needed, and in doing so, according to the claim, according to the claimant, she struck her knee on her own desk. Now, she had a hemarthrosis, which is internal bleeding in the knee joint where she had the operation, and she was off work from November 14th of 2002 until she returned on March 30th of 2003. So it's 19 and six-sevenths weeks. The duration of her being off work is really not a disputed issue. What is a disputed issue is this. Ms. Weiler collected her entire salary for this time of 19 and six-sevenths weeks off work. She had accumulated sick leave, enough to cover that amount of time off, and she received her full salary. Now, we're raising the issue on behalf of the employer that under Section 8J2... But before we get to that, are you saying causation is no longer in dispute? No, I'm not saying that, Judge. I... You say what... you led into that by saying what is in dispute. I thought I'd cover this issue first because I thought it was the more interesting issue. If you'd like, I'll talk about causation first. Well, I thought you were starting to talk about causation when you got into the facts that you hit her knee and she had a preexisting condition. Right. Okay. So let me explain that, and then I'll get back to the topic of the credits. Causation. The petitioner had this surgery six days before the accidental injury she complains of. Now, when we're taking the deposition of Dr. Rosso, Rosso is the one that actually did the operation, the knee expert. Now, it turns out that the petitioner had been on Coumadin since 1996. The reason why was because she had a CVA, a stroke, and she was on Coumadin to prevent her from having another stroke. Well, they stopped the Coumadin about three, four, five days before the surgery, but the family physician gave her a different blood-thinning medication called Lovinex. And Dr. Rosso testified at page 45 and 46 of his deposition that this Lovinex has an unacceptable risk of causing hemarthrosis after the surgery. He doesn't allow his patients to take the Lovinex either in the immediate pre- or post-operative period. He just didn't know that the other doctor had given the claimant this Lovinex. So it creates an unacceptable risk of bleeding within the joint after the surgery, and that's exactly what happened with this lady. In addition, when she was followed up after she developed this hemarthrosis, they take these tests called pro-times, which measure the time of clotting of the blood, and they take a measurement called INR, which is a measurement of the blood-thinning agent in the blood to determine if the person has enough or too much. And let's assume all of that is true. How would you get by the argument probably opposing counsel is going to make, look, this may be true, but in these cases where there's a pre-existing condition, so to speak, that you've alluded to, recovery will depend upon whether or not there's evidence that it accelerated or aggravated the pre-existing condition. And he's going to say, well, she bumped her knee, and as a result, you have the causal connection by Rosso saying that that aggravated the pre-existing condition. Well, Rosso admitted that, Rosso admitted that it's possible that the bumping of the knee was strictly superficial and had absolutely nothing to do with the hemarthrosis. The hemarthrosis was probably already present because the petitioner in her report to Rosso indicated that the blood spurted out, which wouldn't happen unless there was already internal fluid tension within the knee. And our expert, Dr. Player, in his report indicated that due to the hemarthrosis, the hemarthrosis was already present. Due to the surgery, due to the excess amount of blood thinner that she did have after the surgery when she was tested, she was tested in December, she had about two to three times as much blood thinner in her system as she should have had, and her pro-time was two to three times longer than what it should have been. And Rosso also opined that the trauma she sustained at work on November 13th increased the pain and swelling in the knee. There was no other documented source of an injury or irritation. Is that enough for the commission to hang its head? Well, I think not in consideration of what Dr. Rosso admitted on cross-examination that the Lovinex, I don't think he knew about the Lovinex until on cross-examination we were going over these records, and I raised a question about it. Well, what is that? And, you know, I think that was his surprise moment to find out that this other doctor had prescribed this medication that does indeed lead to an unacceptable risk of this type of complication. I have a question, and maybe I'm not thinking well this morning. You admit that she was in the course of her employment, correct? Right. Okay. How did this arise out of her employment? What risk was she exposed to, to a greater degree as an employee of Elgin School District? I mean, people hit their knee all the time. People get up and hit their knee all the time. So what about that? Did anybody talk about that? No, that hasn't been thought of. I think that's a very basic thing, it seems to me. Was that raised and argued before the arbitrary commission? No, no, sir. Wouldn't it be waived? I mean, it's an interesting question, but... It seems to be a basic question, but I guess Elgin just waived it. It was never argued. Everybody gets enthused about warfarin treatments. They must have missed the forest because they're looking for trees. What about your Section A.J. credit argument? Okay, A.J. credit. If you look at A.J. credit, the petitioner of the claimant did receive full salary for all the time she was off work. Under Section A.J., the employer has no credit for payments except compensation under this Act. But then the second clause of A.J. 2 says, and where the employee received payments other than compensation payments, whether it was full or partial salary or group insurance payments or bonuses or annuities or other payments, then the employer should have credit for each such payment to the extent of the compensation that would have been payable during the period covered by such payment. You know what? You present a very logical, very compelling argument, in my personal opinion, on that. But then the question is, what about this TPAC case? Well, the TPAC case may be differentiated or distinguished on the ground that there was testimony in TPAC from a fellow by the name of Cary that the sick payments were payable whether or not the claimant was injured at work. And it looks like the Court may have inferred that the policies or procedures that TPAC had in place would actually allow the person to collect the salary as sick leave and collect the worker's compensation if it were awarded by the commission for the very same weeks. And we have nothing like that in this case. You're saying in that particular case it was confined to its facts. Confined to its facts, it may make sense. That's what I'm saying, yes. How does this affect her pension? What's the argument there? Well, the petitioner said that if she would retire with some unused sick leave credits, it would boost her amount of pension credits. But I asked her whether there is some maximum number of pension credits one can receive. And once the person's received the maximum, then any additional credits do not affect the actual pension. And the petitioner didn't know the answer to that. Now, that's really relevant, because she had worked greater than 20 years for this district. So her not answering that question, whether having some additional sick leave would have really affected her pension, she failed to answer that question. Well, I have a question. Does the employer know? The employer probably does know. But I don't personally know and didn't have that information. Would she have had the option to just have the sick leave time paid to her in cash? No, she did not. Not on retirement or at any other point. Use it or lose it type situation. Yes. Could be so, sir. What about the average weekly wage issue? Well, the average weekly wage issue, I think our point here was that this petitioner worked for an annual salary. In the 52 weeks ending with the last full pay period before her occurrence, she had earned $61,459 during those 52 weeks. She was an employee for the entire 52 weeks. And since she was an annual employee and she had no lost time during those 52 weeks, our proposal is to divide the total earned, the $61,459, by 52 weeks to compute the average weekly wage. Isn't that, isn't your position sort of foreclosed by this panel's recent decision in the Washington District Schools? Have you read that case? Yes, yes. I mean, our position is really very much identical to what Washington District 50 presented. Which was rejected. And it was rejected by the same panel, essentially. You're asking us to revisit this? Yes, right. I'm giving you an opportunity to reverse yourselves if you so elect. Okay. So, anyway, with the TPAC case, I think it's at least distinguishable. And I think that the principle that the legislature was trying to raise when they amended the act in 1965 to add that second clause was to establish a principle that if a person, a claimant, is paid a salary or a wage that is tied to a specific period of their life, then they're entitled to a salary. And if they have lost time from work or disability from work, then the salary paid for that specific time should be credited against workers' compensation benefits awarded for that very time. And that's what we have here. We have the claimant being awarded temporary total disability on the grounds she couldn't work for a very specific time, which is November 14th, 02, to March 30th, 03 inclusive. And we have payments to the petitioner of her full salary for that same time, and the full salary payments exceeded the amount that she would have received under temporary total disability. So she made, well, I don't know how cautious her choice was, but the policies of the district allow the claimant to receive their full salary if they so desire, if they have enough sick leave in a work-related situation or not. Or if they prefer not to use up their sick leave, they can notify the district, the HR department in the district, that they want temporary total disability benefits instead. This petitioner admitted she didn't write any such note or letter or any communication to the HR department to ask for temporary total disability instead of her salary. She just drew her salary for this entire 19 and six-sevenths weeks, and then after it's all over with and some time has passed, she says, well, I don't know. By then, she's making a claim for temporary total disability for the same period. So our position on behalf of the district is that Section 8J2, the second clause, grants credit to the district such that the district does not have to pay double for the same 19 and six-sevenths weeks. And you're saying that's pursuant to the plain language of the section, right? Plain language of the section, yes, sir. And I think the commission noted the plain language and noted that they thought the plain language of 8J2 really wasn't compatible with TPAC as they read TPAC. And I think that the circuit court in the final page of his decision indicated that he couldn't really correlate the language in 8J2 to the language in TPAC either. And so I'm asking, Your Honors, to distinguish TPAC on its facts, perhaps. Or overrule it. Or overrule it. So you're taking a very bold position. You're asking us to overrule two lines of precedent today. Well, okay. Yes, sir. Yes, sir. Thank you. Counsel, please. Okay. Please, the Court. Mr. Newman, Steve Seidman for the Petitioner, Ms. Weiler. Very seldom do we have three seminal cases that apply to the facts. Here we have CISPRO, Washington, and TPAC. We really need not, in my opinion at least, go much further on the first issue of causation than to look at Dr. Rousseau's opinion. And the circuit court, lower court, did discuss it and said the commission relied on Dr. Rousseau, who opined that the work accident was the eliciting source of the hemoarthrosis. The commission was not persuaded by Dr. Player because his opinion was predicated on the level of coumadin in the claimant system, which the parties acknowledged was unknown. The commission resolved the conflict in medical opinions in favor of Dr. Rousseau, as was its prerogative. And, in fact, that's a manifest weight standard, and I would suggest respectfully that the manifest weight of the evidence clearly supports that finding by Dr. Rousseau. I think that's probably your easier argument. Yes, it is. The most difficult argument is how do you reconcile the plain language of the statute with TPAC? I mean, doesn't AJ2 clearly ostensibly say that the employer is entitled to a credit for benefits that would have been paid irrespective of the occurrence of the work? I mean, isn't that what the plain language says? Yes, it does. And here's how I reconcile it. And, of course, that statute was in effect well before TPAC was decided. And TPAC, and I think this is where the circuit court, in fact, discussed this, the lower court discussed this, that, in fact, they must have considered it, and here's why. And Your Honor pointed this out. In this case, this was denied from the get-go, still denied. It was denied on causation. It was denied on wage. And it was denied on, there was an issue with regard to credit. This particular person had to take her sick time. There's evidence, there's no evidence in the record, in fact, it was rejected properly. They had a sample letter from some other petitioner who was on workers' compensation. And there's a difference. That person received workers' comp, and the district gave them the choice to either take the sick time or the workers' comp or a combination of the two. Now, here, this particular individual, and the only testimony in the record, and by the way, TPAC makes clear the burden of proof is on the respondent to show otherwise. In this particular case, this teacher took her sick time. Now, that has a very deleterious effect on her right to receive pension benefits forever. So that diminution of what she took for that 19 weeks will now affect her pension forever. And, in fact, when she was asked, she says, that I don't know, meaning another question, but I do know that the accumulated sick days is very important. And since I used up so many sick days, it reduced the amount that I would have received as my retirement benefits. So that trumps the plain language of the statute? One size doesn't fit all is what TPAC is saying. And in TPAC, the exact same set of facts existed. There was no difference in the set of facts. In TPAC, what the court said was, under the act, the employer receives no credit for benefits, which would have been paid irrespective of the occurrence of a worker's compensation. I've got it in front of me, too, and I'm serious. It comes out of left field. There's no citation to authority. It seems to be contrary to the plain language. Where does that come from? Is that a true statement? Is it a true statement? I'm asking you, is that a true statement? Yes. Yes, that's indeed true. In fact, there's case law clearly that if there's a non-occupational benefit paid, there's no credit. In other words, if that benefit is available for both occupational and non-occupational purposes, then, indeed, they can't get a credit for that. So what's the purpose of 832, then? That's a good question, and I struggle with this. I think you need to answer that. Well, I don't know that I can. In other words, I could say clearly one size doesn't fit all in this situation. And, in fact, in TPAC, I understand what TPAC said, and I understand it didn't really clearly elucidate it very well, but the lower court said it must have obviously considered 832. Here's the situation. This particular petitioner, it's different if they said, okay, this is a compensable worker's compensation accident. We're going to pay you TTD. You make the decision. If you want to take sick time back, you've got to, obviously, we're going to take credit for what we pay you since you're going to get temporary disability. Here, there's a real loss to the petitioner, and it is unfair for her to be affected in the future by losing her sick days. Well, doesn't the answer go to the legislature? I mean, you have a statute that, ostensibly, under your interpretation, is really rendered meaningless in the facts of this case. It's meaningless. I'm not sure it's meaningless, Judge. I think there's an interpretation. Well, I mean, clearly, courts have the right to interpret statutory construction. They can interpret it the way they want. I understand in TPAC, they clearly said there was not credit for a non. If these things were available, whether you get hurt or you don't. Period. You don't get them. They don't get the credit. Right. Okay. But here, same situation, and I know the facts are identical to TPAC in Your Honor's question, I realize is, well, you have a statute that says one thing, and you have TPAC basically saying another. But the fact is, that's because, and I'm going to get back down to fundamental fairness, which you don't see a lot in comp, but it's there. Here, there's a real loss to the petitioner. And it's a factual, at the very best, it should be a factual analysis case by case, but it's the burden of the respondent to prove otherwise. Here, they didn't prove otherwise. They didn't attempt to show that this diminution that this woman claims existed didn't. The only evidence extant in the record is that there was a very real loss to this woman's pension because she couldn't use those 19, because she had to use sick days for those 19 weeks. And so that's an exception that should be engrafted into the plain language of the statute. Well, it can be interpreted, you know, it's judicial, obviously it's judicial interpretation of the statute. The plain language is the plain language. Are you saying, I'm concerned about this letter, this letter was admitted into evidence? It was not admitted into evidence. It was, sorry to interrupt. In fact, it was denied, it wasn't admitted into evidence for a bunch of reasons. One is it wasn't written to the petitioner. So it's not in evidence. Right, it's not in evidence. It wasn't written to the petitioner. And two, it was to an individual who was on workers' compensation. So in this particular case, that they, this letter, it's someone who was eligible for workers' comp benefits. Okay. Then let's stay with this case. There's no letter. Is there anything there explaining that this employee was not entitled to sick pay? I'm sorry, Judge, I missed that. Well, I'm looking at this. Yes, this letter after letter. It doesn't apply to payments made under any group plan which would have been paid irrespective of an accidental injury under this act. Is there anything going to answer that question? With regard to the letter that didn't get into evidence? No. Oh, just generally. Okay. In regard to sick pay. Okay. And sick pay would be definitely Ms. Weiler, if she was sick, she could have received these same benefits, whether it was occupational or whether it was non-occupational, she could receive her sick time. And it definitely, that is definitely the case. That is inevitable. Yes. Okay. If she, in the absence of an occupational injury, can she get her salary and her sick time for the same week? No. No. It's one or the other. So she's got to be sick. She's got to get one or the other. Yes. Yes. She's got to use her sick time. Well, it occurs to me that if she wants the TTT, she's got to pay back the sick time and gets re-credited for it. If she wants the TTT, the point is now she's retired, so if she pays back the TTT, they don't pay you. It's not use or lose a debt. That gets credited towards your pension, but you don't get that sick time in a cash check when you leave. So Ms. Weiler isn't entitled. No, no, no. But prior to the time you're leaving, you're entitled to so many sick days. Yes. And that's the bank. And if you don't take them before you retire, then you get a higher pension. Yes. All right. Now, if you can't take the sick days and get paid salary while you're working for the same week, it occurs to me that you can't take sick time and get TTT for the same week either. TTT is only for the purpose of recompensing you for lost salary, lost income. She hasn't lost any income. She took her sick time. Now, if she wanted the TTT, she's got to pay back the sick time, and then it gets recredited for her pension, et cetera and so on. The problem you've got now is she's already retired. You can't recredit as a problem, Judge. Yeah, but that's not the problem with the statute. The statute says in each such payment only to the extent of the compensation that would have been payable during the period covered by such payment. It wouldn't have been payable during the period covered by such payment, absent an injury compensable under the Act. Nor would she have gotten it if she was sick. You're correct. But the point is there's harm, and this is where you get into the problem with the statute, and that's why TPAC is a just decision, because at the end of the day, what you've done is you can deny workers' comp for these people, make them take their sick time. They lose their pension credits forever. It's not one of these things that they can get it back. She can now, if she pays back, let's say ---- The only problem is she retired. If she were a working employee, this could be adjusted very easily. No, Judge. She gives back the money and they recredit her. Respectfully ---- What you're saying is to understand the teacher's plan. Right. It's not about money. It's about time. It is. So you don't pay back money. You can't pay back. And you also, unfortunately, because I represent a few teachers, you can't get the credit back. Right. This is a terrible situation, even if there's a decision, because I've had it happen, where there's decisions. You can't get that credit back even after you win the TTD and want to pay it back. So although this is not the record ---- Why can't you get it back? Because the TRS will not allow the credit to occur after the fact. So we've had decisions where TTD has been awarded in the decision, and the people have tried to go back to TRS and say, give me the two ---- I just want my pension credits back. They say you can't do it. You've already used it. Whether they're retired or not is not the issue. Well, it occurs to me the problem, then, is with the teacher's pension statutes. It's not what the workers compensation act. Judge, you're probably exactly right. But here's the problem. There are burdens of proof here, okay? And under TPAC, our burden was to prove what we proved, all right? And then if the school board wanted to ---- What you're telling us is TPAC would make a good statute. Unfortunately, we're not the legislature, and we ought not be legislated. And, you know, it's a good thing, but it's not our job. Somebody ought to go to the legislature and tell them to amend the statute or amend the pension statute and let them pay it back. You know, all I can say is the TPAC court ruled the way it did. And I know it's going to take over ruling the TPAC, which is ---- this is precedential, and I understand that. And I do, intellectually being honest about it, I do understand your argument. There's no way I could stand up here and sort of argue anything else. But practically, I see the effects that this has, and I understand, Your Honor, it's just I understand why TPAC is just not one size fits all. And I think that's what TPAC was trying to say. Thank you. Thank you, counsel. Rebuttal. Thank you. I mean, I would like just to emphasize that section, that second clause of section AJ2 in which it says that the employer, in the event of salaries being paid, shall receive credit. It's mandatory. It's not discretionary. And I agree entirely that the TPAC case should be changed, distinguished just to its facts or overruled. So thank you. Thank you, counsel. The court will take the matter under.